**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Marco BETANCOURT, et al.,**
**Defendants–Appellants.**

**Nos. 85–5612 to 85–5615 and 85–5679.**

United States Court of Appeals,
Sixth Circuit.

Argued June 5, 1986.

Decided Feb. 1, 1988.

Rehearing Denied in Nos. 85–5612 and
85–5679 March 24, 1988.

Paul M. Rashkind, Bailey, Gerstein, Rashkind, Dresnick, F. Lee Bailey (argued), Miami, Fla., for Betancourt.

Louis DeFalaise, U.S. Atty., Lexington, Ky., James Zerhusen (argued), Robert Rawlins, Covington, Ky., for U.S.

Wilbur M. Zevely (Court-appointed), Florence, Ky., for Cubillos.

H. Fred Hoefle (Court-appointed), Cincinnati, Ohio, for Zapata.

David R. Irvin (argued), Bulleit, Kinkead, Irvin, Reinhardt, Lexington, Ky., for Santibanez.

Thomas F. Almon (argued), Miami, Fla., for Cabrera.

Before KEITH and BOGGS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

BOGGS, Circuit Judge.

This case arose out of a complex laundering scheme for money derived from Colombian drug transactions. The scheme involved the transfer of cash to a courier in Miami. The courier would take the cash to Northern Kentucky, deposit it in banks and draw checks upon it for use of the funds in Colombia. Five defendants were tried in the United States District Court for the Eastern District of Kentucky in 1985 for violating 21 U.S.C. § 846 by conspiring to distribute, to possess with intent to distribute, and to aid and abet others in the distribution of cocaine. Each defendant was also charged with violation of the Travel Act, 18 U.S.C. § 1952. All were convicted. All defendants now appeal, raising a variety of objections, primarily concerning the adequacy of the evidence to connect each of the defendants to the conspiracy. We have carefully considered all of the points raised by the defendants below, and we affirm the district court's judgment of conviction entered on a jury verdict.

**I**

The existence of an underlying conspiracy or conspiracies is not disputed by any of the defendants. Luis Pinto, a Colombian educated in the United States, laundered up to $25,000,000 in American currency for Gonzalo Rodriguez from 1981 to 1983. He would obtain cash in Miami, deposit it in various accounts in Northern Kentucky in transactions of less than $10,000 to evade Federal reporting requirements, and then transmit bank drafts or cashier's checks to Colombia where Rodriguez could obtain access to the funds. In June 1983, Rodriguez wanted to end the relationship. However, in May, Pinto had met Humberto Cardona, who desired Pinto's services. Fundamentally, each of the transactions involved in these charges consisted of Cardona or an associate, Ruiz, transmitting money to Pinto with the assistance of one or more of the five defendants.

In May 1983, Pinto flew to Miami, met Cardona, and was introduced to a man called "Domingo." Cardona said Pinto would see Domingo again and receive money from him. Pinto identified "Domingo" as defendant Dr. Amador Cabrera. "Domingo" told Pinto that any future meetings would be at the same place, a parking lot near the Coral Gables Hospital, where Dr. Cabrera was a staff member.

Later that evening, a man identified as "Alvaro" arrived where Cardona and Pinto were drinking. Pinto identified "Alvaro" as defendant Alvaro Cubillos. Cubillos and Cardona talked privately, then left together and returned together in 15 to 20 minutes, Cardona carrying a package wrapped in brown paper containing $350,000, which Cardona identified as "our money." Pinto returned to Northern Kentucky and converted the $350,000 into 23 checks or drafts, which he carried to Colombia and delivered to Cardona.

In June 1983, Pinto made a trip to Colombia and Miami, though he ended up handling no money. He first went to Bogota, met Ruiz and Cardona, and was given two "beeper" numbers, one for "Domingo" and

one for "Carlos," then unknown to Pinto. On July 5, Pinto called the number for Domingo, received a return call from him, and was told by Domingo that "there wasn't anything ... until one of the two guys in Bogota ... come to talk to him." Pinto also called the beeper number for Carlos, received a return call and was told that Carlos was "out of town getting the packages," and was asked to wait another day. Pinto also spoke to Cardona and was told to wait another day for Carlos. However, nothing transpired and Pinto returned to Kentucky.

Ruiz called Pinto in late July and told him he could come to Miami and get some money. Pinto met Ruiz in Miami on July 29. Ruiz made a call and the two were shortly joined at a bar by "Carlos," later identified by Pinto as defendant Carlos Santibanez. Pinto understood this to be the same Carlos whose beeper number he had been given. Ruiz and Carlos left, saying they were going outside, and soon returned together, with Ruiz carrying a package containing $100,000. Pinto returned to Kentucky, and repeated the laundering process.

In early August 1983, Pinto went to Miami, went to Ruiz's apartment, and was given $250,000. Pinto left an empty suitcase for future use, returned to Kentucky and laundered the money. Ruiz called Pinto on August 15, said he had talked with Domingo and would have more money for Pinto. On August 17, Pinto went to Miami, went to Ruiz's apartment the next day, and was given his suitcase with $100,000 in it. Ruiz said it was difficult to collect money right now as no one wanted to pay. Pinto and Ruiz took the suitcase to Miami Airport, checked it to Cincinnati, and alerted Pinto's son. The son picked up the suitcase and deposited the money.[1]

Pinto then drove Ruiz to an office near the airport, where Pinto was introduced to defendant Marco Betancourt. Betancourt and Ruiz talked, and told Pinto they had to go talk to someone. The three then drove to another office where Pinto was introduced to defendant G.D. Zapata. Pinto saw and heard Betancourt and Zapata argue over how much money Zapata owed to Cardona and Ruiz. Betancourt said the amount was $500,000. Zapata said he needed time to check his records and the four men agreed to meet again on the afternoon of August 20.

That morning, defendant Cubillos came to the Ruiz apartment and Ruiz, Pinto, and Cubillos went to a nearby restaurant, where defendant Betancourt joined them. The four then went to an office in Miami marked as the office of Zapata, where they met defendant Zapata and a friend. FBI agents observing the office saw a "lookout" remaining outside the office. Zapata acknowledged to Betancourt a $240,000 debt, but said he could not pay. Betancourt agreed that $240,000 was the right amount. Zapata and Ruiz then discussed the debt and means of payment. Zapata said he could pay if he could sell some "grass," asked for more "merchandise" (which meant cocaine, according to Pinto), and was told he would not get any until he paid. Cubillos agreed to call about the money the next week. The four then left. Betancourt told the four that they should all leave in one car and then "as a precaution" drive aimlessly to see if Zapata or his friends were following.

Shortly afterward on the same day, Pinto and Ruiz went to a bar in response to a beeper call, and met three men. Pinto was told one was a pilot, and Ruiz and the pilot went to another table and talked for an hour. Ruiz said the men had just arrived from Peru with "100 kilograms" of "merchandise" and wanted to be paid for the transportation. Ruiz asked Pinto to take him to see the "doctor" at Coral Gables Hospital. Pinto asked who the doctor was and was told "Domingo." They went to the parking lot used before, and Pinto saw Ruiz and defendant Cabrera talk. Ruiz returned, said that there was only $17,000 and that if Pinto could wait until the next day there would be more money.

---

1. The bank teller who received the money put it aside and called federal agents. A narcotics-detection dog alerted on the money, and subsequent analysis identified cocaine on the money.

The next morning, Pinto and Ruiz again went to the parking lot, and met Cabrera. Ruiz told Pinto that Ruiz had to do "some business" with Cabrera, and that Ruiz would go with Cabrera to pay the pilot for the trip. Ruiz and Cabrera then left together. Within ten minutes, a man came up to Pinto's automobile, said "this is for you," and gave him a brown package, similar to the packages in the other transactions, with about $90,000. Pinto returned to Northern Kentucky, began laundering the money, and was arrested on August 26. The beeper number Pinto was given for "Domingo" was leased by Cabrera's sister with Cabrera listed as the customer, and was cancelled on the first business day after the arrests.

This series of transactions makes it clear that there was a significant conspiracy involving, at a minimum, Pinto, Cardona, Ruiz, and a number of assistants manning phones, carrying packages, and collecting money. Each defendant disputes the sufficiency of the evidence linking him, individually, to these transactions, and disputes his connections with Pinto's Travel Act violations.

## II

The individual defendants' objections to the substantive sufficiency of their convictions are given below. Defendants are considered in the order in which they appear in the narrative above.

*Domingo Cabrera* ("Domingo"; "the Doctor"). Cabrera contends that there is no evidence that he knew what Pinto would do with the money, and that he had no other knowledge of Pinto's interstate travel. Thus, citing *United States v. Alsobrook*, 620 F.2d 139, 143–44 (6th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980), he contends that the Travel Act conviction cannot stand. He also contends that there is no evidence of any connection between him and distribution of cocaine, and no evidence that he ever handled cocaine or spoke of it to anyone. This failure cannot be remedied by the testimony of Pinto as to the statements or actions of others, for two reasons.

First, Pinto's testimony is generally hearsay, and the existence and requisites of the conspiracy necessary to introduce co-conspirator hearsay have not been proved. Second, even if some conspiracy were shown, for example between each defendant and the Pinto–Cardona–Ruiz combine, there was no showing linking up the conspiracies into a single conspiracy.

*Alvaro Cubillos* ("Alvaro"). Cubillos makes the same contentions as to the substance of the Travel Act and cocaine conspiracy counts: he did not know Pinto was travelling, and he never touched or discussed cocaine. Even if he were linked to the package Cardona carried, there is no evidence that the money came from cocaine. In addition, he contends that none of Pinto's testimony should have been admitted because Pinto's own sentence was contingent on a guilty verdict in this trial. He contends that this goes beyond normal leniency for truthful testimony, and gave Pinto overwhelming incentive to lie.

*Carlos Santibanez* ("Carlos"). Santibanez contends that he had no connection with the conspiracy beyond his "mere presence" at a package transfer, and that his Travel Act conviction cannot stand if the conspiracy count falls, as the only actual travel was by alleged co-conspirator Pinto.

*Marco Betancourt* relies primarily on the argument against use of co-conspirator hearsay, based on failure to prove a conspiracy. He also argues that, even if a conspiracy were proven, he was not part of it. He contends that his only actions were merely being present while others may have transacted business related to the conspiracy. He also argues that he had no knowledge or intent sufficient to sustain the Travel Act convictions.

*G.D. Zapata* repeats the Travel Act arguments, contends that the reference to the dealing in "merchandise" is insufficient to provide a cocaine connection for his activities, and attacks the use of co-conspirator hearsay and the testimony of Pinto.

## III

■ Taking all of the evidence in the light most favorable to the prosecution, as

we are bound to do, *United States v. Gallo,* 763 F.2d 1504 (6th Cir.1985), *cert. denied,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed. 2d 798 (1986), and giving full credence to the testimony of Pinto, as the jury was entitled to do, a rational jury could have found that the following evidence connects each defendant to the conspiracy and to the interstate travel by Pinto.

*Cabrera.* Pinto was specifically told in Cabrera's presence that he would receive money from Cabrera. Pinto was given a special beeper number, listed to Cabrera and cancelled at the first sign of trouble, to contact Cabrera under the code name "Domingo." Several additional meetings were held in the location Pinto had been told by Cabrera would be used for such meetings. One took place immediately after Ruiz said he wanted to get money to pay for a shipment just in from Peru. On that day, immediately after a conversation with Cabrera, Ruiz told Pinto that only $17,000 was available, but there would be more the next day. The next day, Ruiz said he had to do some business with Cabrera, and that they would go to pay the pilots. Ruiz and Cabrera did talk. Almost immediately after that conversation, $90,-000 was given to Pinto by a courier. These circumstances would certainly support the inference of Cabrera's participation in the conspiracy. His direct introduction to Pinto would support the knowledge of Pinto's travel. In particular, the inference that Pinto was traveling in interstate commerce is supported by the logic that if only local business transactions were afoot, there was no need for the repeated introduction of an occasional, outside, source such as Pinto.

*Cubillos.* Cubillos met with Ruiz, departed with him and returned with a package containing $350,000 which was given to Pinto, and which Cardona identified as "our money." The jury was entitled to consider this participation as more than "mere presence" at this transaction, even if Cubillos was not seen touching the package. The jury could infer that Cubillos was the source of the money, which Ruiz did not provide to Pinto any earlier. Cubillos also participated in the second visit to Zapata, and specifically agreed to contact Zapata again about the debt to the Ruiz–Cardona enterprise.

*Santibanez.* Santibanez participated in a similar transaction of fetching a package, this one containing $100,000, which was given to Pinto. Again, in these circumstances, it was not necessary for Pinto actually to have seen Santibanez handle the money to permit the inference of participation in the transfer. Santibanez was also introduced as the "Carlos" to whom Pinto had made phone calls concerning money collection through the "beeper" numbers provided by Ruiz and Cardona.

*Betancourt.* Betancourt was introduced to Pinto by Ruiz, and the three immediately went to a meeting in which Betancourt assisted Ruiz in discussing the debt owed to the Ruiz–Cardona combine by Zapata. The next day Betancourt again was part of the group confronting Zapata over his debt, and specifically confirmed the size of the debt. He was present during the discussion of Zapata's desire for more cocaine and his sales of marijuana to obtain funds for a purchase. Betancourt also suggested evasive maneuvers to discourage surveillance. It was not necessary for Betancourt to speak any particular words to indicate the type of debt being collected to evidence his participation in the collection of money for Pinto to transport. In light of the magnitude of the debt, and the evidence of the type of business of Ruiz and Cardona, the jury was not required to hypothesize some other type of debt as the subject of the conversations. The jury was entitled to infer Betancourt's participation in the cocaine business from the circumstances of his activities in the debt collection efforts.

*Zapata.* Zapata was directly linked to the Ruiz–Cardona enterprise by his acknowledgment of the debt of at least $240,-000, his desire to purchase more cocaine, and Cubillo's agreement to contact him again for the money. The circumstances of the debt collection efforts in the presence of the courier, Pinto, also would support an inference of the necessary knowledge of Pinto's travel.

The evidence considered by the jury properly included Pinto's recitation of conversations involving other members of the conspiracy. The district court carefully held a separate hearing before allowing Pinto to provide hearsay testimony under the co-conspirator exception, Fed.R.Evid. 801(d)(2)(E). His ruling that the conspiracy and each defendant's membership in the conspiracy was shown by a preponderance of the evidence was consistent with *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The judge's ruling on this evidentiary matter was not erroneous.

■ The evidence set forth above was sufficient to sustain the convictions. The evidence linking each defendant to the conspiracy, while short of overwhelming, would justify a rational trier of fact in finding beyond a reasonable doubt the slight evidence needed to connect each defendant to the conspiracy whose existence was amply proved. *United States v. Chambers,* 382 F.2d 910 (6th Cir.1967). This rule is not inconsistent with *Bourjaily.* The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great. *See United States v. Marsh,* 747 F.2d 7, 13 (1st Cir. 1984) (noting that the "slight evidence" rule is better called the "slight connection" rule).

■ Several defendants contend that even if the evidence showed a conspiracy to which they were connected, there was no evidence that the conspiracy involved cocaine, as charged, rather than some other drug. Pinto's testimony, including flights from Peru and very large amounts of money, provided ample evidence of cocaine as the general source of profits of the Ruiz–Cardona operation. In addition, the presence on some of the money of cocaine in quantities sufficient to allow detection by a police dog is circumstantial evidence of the source of the profits. There need not be specific evidence of an individual drug transaction for a conviction under 21 U.S.C. § 846. *United States v. Orozco–Prada,* 732 F.2d 1076, 1083 (2d Cir.), *cert. denied,*

469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984). Each individual defendant was not required to know the source of the profits of the conspiracy, so long as the conspiracy did involve the distribution of cocaine and he was shown to have furthered the conspiracy. *United States v. Warner,* 690 F.2d 545, 549 (6th Cir.1982).

■ Several defendants attack their convictions under the Travel Act, arguing that there was no evidence that they knew of Pinto's interstate or international travel in furtherance of the conspiracy. The general rule is that the actions of each conspirator may be attributed to a co-conspirator for purpose of satisfying the elements of any criminal act. This has generally been held to be the rule with regard to the Travel Act, so that the knowing travel by one conspirator constitutes a violation of that Act by other conspirators. *See* cases collected in *United States v. Gallo,* 763 F.2d at 1521 n. 25; *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In this circuit, however, we have stated the rule that a violator of the Travel Act must have actual knowledge of the nature of the travel by the traveler. *United States v. Prince,* 529 F.2d 1108 (6th Cir.), *cert. denied sub nom. Pandelli v. United States,* 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976). More recently, the rule has been criticized in our circuit, and its application significantly relaxed. In *Gallo,* 763 F.2d at 1521 n. 25, we noted the weakened state of our rule. In *United States v. Alsobrook,* 620 F.2d 139, 143–44 (6th Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980), we announced the rule that if a party should reasonably have known of the traveler's actions, then it can be held that he did know. In the circumstances of this case, we believe that the actions of each defendant come within the *Alsobrook* standard. The participation in the transfer of large amounts of money through a central source based in Colombia means that it is entirely reasonable that each of the persons in this operation should have known that the money would eventually be transmitted to the source of the drugs, which

was not within the state of Florida. The jury is not required to believe that the money was going into the hands of the Tooth Fairy.

## IV

■ Several additional objections are made to specific evidentiary rulings. Cubillos attacks Pinto's testimony in its entirety, arguing that Pinto had too great an incentive to lie, since his own sentence depended on a successful outcome of the trial. All of the circumstances surrounding Pinto's plea agreement were fully brought out in both the voir dire and the trial testimony of Pinto. There was no evidence that the actual jury verdict would have any impact on Pinto's sentence.

The only case authority for the proposition that a plea agreement may so taint a witness's testimony that it must be excluded altogether, rather than simply making it subject to attack, is *United States v. Waterman*, 732 F.2d 1527 (8th Cir.1984). There, an earlier panel decision favorable to defendants was set aside on en banc consideration, and the district court's judgment of conviction ultimately upheld by a equally divided court. In that case, the plea agreement provided that the government would not recommend any reduction in sentence if a witness's testimony before the grand jury did not lead to indictments. Even this pure "contingency fee" arrangement was ultimately upheld by the equally divided court. In a case with slightly less unappealing facts, *United States v. Dailey*, 759 F.2d 192 (1st Cir.1985), the First Circuit upheld a conviction where the plea agreement stated that the government would recommend a reduced sentence depending "upon the value to the government" of the testimony. Thus, there may have been an incentive for the witness in a particular outcome, though no pure "contingency fee."

In our case, however, there was no correlation between the value of Pinto's testimony, or any outcome secured by Pinto's testimony, and any agreement as to the government recommendation on sentencing. Pinto agreed to testify honestly. The only contingency was that if his honest grand jury testimony resulted in indictments, he would be obliged to continue to testify honestly at the trial. Where there is no incentive or contingency arrangement, even the considerations discussed in *Dailey* and in *Waterman* do not apply and there is no occasion to prevent or question the use of such testimony. *See United States v. Fazzino*, 765 F.2d 125 (8th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985).

■ Santibanez contends that the jury should not have been provided with a transcript of Pinto's testimony. No formal objection to the instruction on use of the transcript was made, which should bar consideration of the matter. Fed.R.Crim.P. 51. In any event, the furnishing of transcripts to a jury is generally well within the district court's discretion. *Government of the Canal Zone v. Scott*, 502 F.2d 566, 570 (5th Cir.1974). In this case, the difficulty in understanding Pinto's heavily accented English provided sufficient basis for the judge's ruling, and the judge carefully informed the jury, in standard terms, that all of the evidence was to be weighed, and no undue credence was to be given to any single part of it.

■ Santibanez also contends that information about Pinto's polygraph test, made pursuant to his plea agreement, should not have been admitted into evidence. In this regard, the several defendants in this case placed the judge in a classic "double bind." Pinto's performance on the polygraph was sufficiently weak that four of the defendants demanded that it be introduced, as a means of discrediting Pinto. By Santibanez's insistence that it not be introduced, the judge was faced with a dilemma of providing a potential reversible error either way he ruled, or granting a severance in the middle of trial, though no severance motion was ever formally made. The judge's decision was within his discretion and did not prejudice Santibanez. The judge offered to admonish the jury not to consider the evidence with regard to Santibanez, so even his tactical position would be preserved, should the jury have conclud-

ed, contrary to the position of the four codefendants, that the polygraph test aided rather than undermined Pinto's testimony. Counsel for Santibanez refused the admonition, and made no objection when the other defense counsel referred to the test results.

We find all of the rulings on disputed evidentiary matters to be well within the discretion of a trial court.

## V

■ Defendants Cabrera and Zapata attack their sentences as improper because imposed under 21 U.S.C. § 846, not the lesser penalties of 18 U.S.C. § 371. Cabrera also attacks the imposition of his sentence because of alleged errors in the pre-sentence report.

Defendants rely on the case of *United States v. Quicksey*, 525 F.2d 337 (4th Cir. 1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). There, it was held that a special conspiracy count under 21 U.S.C. § 846 was not proven where the jury's single verdict could have encompassed a general conspiracy under 18 U.S. C. § 371, which was also the subject of instruction. Here, however, there was a single conspiracy covering both the cocaine distribution and the Travel Act violation. If the defendants violated the Travel Act (which the jury found), it was only as a result of exactly the same conspiracy as in the cocaine count under 21 U.S.C. § 846. The jury was instructed solely under 21 U.S.C. § 846. Thus, there was no possible ambiguity in the jury's verdict. Perhaps because this point was so clear, no objection was made at the time the instructions were given, nor at any other time during the proceedings below.

With regard to Cabrera's objections to his pre-sentence report, the judge acted properly in stating that he would not consider any of the disputed matter in determining sentence. Fed.R.Crim.P. 32(c)(3)(D). He also ordered that the defendant's objections to the pre-sentence report be included along with the report, for any future consideration within the prison and parole system. Plaintiff retains the opportunity to challenge any matters which may be used to his disadvantage at a later stage of the process of incarceration. *United States v. LeBlanc*, 762 F.2d 502 (6th Cir.), *cert. denied*, 474 U.S. 854, 106 S.Ct. 156, 88 L.Ed.2d 129 (1985).

We have found no authority stating that, where a judge has specifically determined that he will not consider certain controverted matters contained in a pre-sentence report, he must nevertheless make findings on the controverted matter. Indeed, the specific language of Rule 32(c)(3)(D)(ii) says "that *no* such *finding* is *necessary*" (emphasis supplied) when the judge does not consider the controverted matter. The case of *United States v. Petitto*, 767 F.2d 607 (9th Cir.1985), relied on by defendant Cabrera, is not to the contrary. The opinion does make some strong statements about findings being necessary, but does so in the context of a case where the record did not reveal whether the judge relied on any of the controverted matter. To the extent that *Petitto* announces a rule that findings must be made even where the judge specifically announces on the record that he will not rely on the controverted matter, that is not the rule in this circuit. *See United States v. LeBlanc*, 762 F.2d 502.

Finding no merit in any of the assignments of error, as described above, we AFFIRM the judgment of the District Court.