UNITED STATES of America,
Plaintiff–Appellee,

v.

Aldotfus WILLIAMS and Terry
Williams, Defendants–
Appellants.

Nos. 00–5261, 00–5489.

United States Court of Appeals,
Sixth Circuit.

July 9, 2001.

Before GUY, BOGGS, and GILMAN, Circuit Judges.

PER CURIAM.

On January 19, 1999, a grand jury handed up a two-count indictment charging Terry Williams, his uncle, Aldotfus "Duke" Williams, and Eleatha Adams with violating federal drug laws. Count I charged the defendants with conspiring to possess with intent to distribute, and actually distributing, in excess of 50 grams of cocaine base (crack), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846. Count II charged all three defendants, each aided by the other, with possessing with intent to distribute approximately 248 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. Terry Williams, facing a mandatory life sentence after prosecutors filed information regarding his prior convictions pursuant to 21 U.S.C. § 851, went to trial. He was found guilty on Count I but acquitted on Count II. Aldotfus Williams pleaded guilty to Count I. Adams also pleaded guilty to Count I but has not appealed. Terry timely appealed his conviction. Al-

dotfus timely appealed his sentence. For the reasons set forth below, we affirm the actions of the district court as to both defendants-appellants in all respects.

## I

This case began when a Mississippi Bureau of Narcotics agent contacted the Shelby County (Tennessee) Narcotics Office and related that a confidential informant claimed to have a source of cocaine in the Memphis area. The informant, Charles E. Alexander, met with Sergeant Booker of the Shelby County Sheriff's Department and explained that he could buy nine ounces of crack from a woman named "Eleatha" who lived at 942 Doris Street in Memphis. Alexander had been dealing drugs himself since 1994 and generally bought 4.5 ounces of crack from Eleatha Adams, who knew him as "Big Daddy," two to three times per week. Alexander had also met Adams's supplier, whom he knew as "Terry" and later identified as defendant Terry Williams. He saw Terry deliver drugs to Adams on several occasions and once received crack directly from Terry.

Law enforcement agents formulated a plan to make a controlled crack buy in which Alexander and Sergeant Booker, posing as Alexander's cousin, would purchase the drugs while detectives operated audio and video surveillance of the Doris Street location. During an initial tape-recorded contact. Adams reported not having nine ounces on hand but told Alexander to remain in touch. A short time later, Alexander informed the agents that Adams finally had some crack available, so Sergeant Booker contacted Adams on the morning of December 18, 1998, and told her that he and Alexander were on their

way. They parked in front of the Doris Street residence, and Alexander went inside. Adams said it would be a few minutes before the drugs arrived, as Terry was at the mall. At this point, Alexander reported that Sergeant Booker did not want to come into the house to deliver the buy money because he feared being robbed. As the morning dragged on, Alexander said he would return in 30 minutes and left the house. When Terry called Adams to ask whether the money had been counted, she explained the situation and said she did not want to go to the undercover car to count it. Terry said he would call his uncle Aldotfus to count the money. Meanwhile, Alexander returned to the car and, with Sergeant Booker, met briefly with the surveillance team before going to lunch.

The surveillance team observed Aldotfus Williams pull up in a green Dodge Dynasty and enter the residence. When the informant and the sergeant returned to the scene, Alexander spoke with Adams again, discussing logistics. Aldotfus shortly re-emerged from the house, went to the undercover vehicle, and got in the back seat. He introduced himself and counted the $6500 in buy money supplied by Booker. Booker asked what the drugs would look like, and Aldotfus produced a baggie containing what appeared to be small rocks of crack cocaine, saying "Like this." Aldotfus advised his clients that his "brother" would bring the "dope" in about five or ten minutes and would be driving a red sports car.[1] Aldotfus then went back inside the house, and Alexander followed him inside. Aldotfus called Terry and reported that the money was in order.

---

1. At Terry's trial, the witnesses described the relationship between Aldotfus and Terry Williams in a variety of ways, with Aldotfus calling Terry his nephew. Their Pre–Sen-

tence Investigation Reports also described them as uncle (Aldotfus) and nephew (Terry), although Aldotfus is three and a half years younger than Terry.

More than ten minutes passed as Alexander stood in the living room waiting. He could see completely through the house and into the back yard. Finally, as Adams moved toward the back of the house. Alexander saw a red sports car approach the rear. Alexander then returned to the undercover car, where Booker was waiting. As Adams testified, Terry arrived in a red Camaro via a back driveway to the house. Adams met him at the car and walked with him into the house, where Terry delivered the crack to her. Adams then went out the front door, followed by Aldotfus, and climbed into the back seat of the undercover vehicle. Adams produced a package containing crack from inside her football jersey. Aldotfus collected the $6500 from Booker and placed it in a Crown Royal bag, a purple velvet sack that covers bottles of Canadian whiskey. Booker weighed the drugs on digital scales and then asked about a discrepancy in their weight. As Adams and Aldotfus tried to explain the problem, a signal was given and agents moved in to effect their arrest. Officers recovered two large pieces of crack cocaine weighing 248.1 grams from the floorboard on the driver's side of the undercover vehicle, the buy money in the Crown Royal bag from the floor where Aldotfus had been sitting, and 2.1 grams of crack from Aldotfus's right shirt pocket.

Another officer covered the back of the Doris Street residence and saw Terry standing at the back entrance when the take-down signal was given. Terry spotted the officer and took off, clearing hedges in the yard and attempting to enter a nearby abandoned house. Terry was arrested while trying to hide on a screened-in porch of that residence. At the spot near the rear door of 942 Doris, from which Terry dashed, officers recovered keys to the Camaro. In the Camaro, they found 87.1 grams of powder cocaine.

Aldotfus pleaded guilty and cooperated with the government. He testified that he began working with Terry dealing drugs as early as 1993, typically delivering or counting money. He also reported that Terry had contacted him after their arrest and asked him to sign something indicating that the drugs all belonged to him and that Terry was not involved. Aldotfus signed an affidavit to that effect and submitted it to the court before Terry's trial. On the stand at Terry's trial, he recanted, explaining that he was on drugs and needed money at the time of Terry's request.

Aldotfus filed no objections to his Pre–Sentence Investigation Report (PSR). At his sentencing hearing, however, he asked to be considered a minimal participant in the drug conspiracy. The PSR held him responsible for 250.2 grams of crack, placing him at base offense level 34, *see* USSG § 2D1.1(a)(3)(c)(3), but awarded him a full 3–level reduction for acceptance of responsibility, *see* USSG § 3E1.1(b). He had seven criminal history points, including two for committing the instant offense less than two years after release from prison, *see* USSG § 4A1.1(e), placing him in Criminal History Category IV. The applicable sentence range was 151–188 months; the applicable statutory minimum sentence for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) is ten years. The district court denied Aldotfus's request for a minor or minimal-participant reduction in offense level because he was "essential and actively involved in the transaction." Pursuant to the government's USSG § 5K1.1 substantial assistance motion and 18 U.S.C. § 3553(e) (authorizing sentences below a mandatory minimum in certain cases), the court departed from the guidelines range and imposed a 75–month sentence.

After the jury convicted Terry of the conspiracy count, the district court sentenced him to the mandatory minimum life sentence.

473

## II

### A. Defendant Aldotfus Williams

A defendant must prove entitlement to a minor or minimal-role reduction by a preponderance of the evidence. *See United States v. Perry,* 908 F.2d 56, 58 (6th Cir.1990). The culpability determination is "heavily dependent upon the facts," USSG § 3B1.2, comment. (backg'd), and this court reviews for clear error the district court's findings of fact regarding whether a defendant is entitled to such reduction. *See United States v. Moss,* 9 F.3d 543, 554 (6th Cir.1993); *United States v. Nagi,* 947 F.2d 211, 214–15 (6th Cir. 1991).

The guideline provides: "Based on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels. (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels. In cases falling between (a) and (b), decrease by 3 levels." USSG § 3B1.2. The district court refused Aldotfus's general request for a mitigating role reduction, and he does not appeal the denial of the minimal-role reduction. Aldotfus argues instead that the district court erred in denying him a minor-role reduction in his offense level. All of the information given to detectives before December 18, 1998, pointed to Eleatha Adams and an individual driving a red sports car, he notes. Additionally, when he arrived on the scene, he simply went to the car and counted the money. He did not participate in the arrangement of the sale, negotiate the price, or, he claims, participate in the delivery.

This guideline "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." USSG § 3B1.2, comment. (backg'd); *see also United States v.*

*Miller,* 56 F.3d 719, 720 (6th Cir.1995). "[A] minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." USSG § 3B1.2, comment. (n.1). As this court has explained, "[a] defendant does not become a minor participant simply because others planned a scheme and made all the arrangements for its accomplishment.... Although defendant may be less culpable than some of his coconspirators, this does not require a finding that he was *substantially* less culpable than the others." *Miller,* 56 F.3d at 720 (emphasis in original; citations omitted).

The district court correctly found Aldotfus Williams "essential and actively involved in the transaction." He counted and handled the money, a task obviously critical to any substantial drug sale, and did so at the request of the conspiracy's central figure when another participant refused to help. He dealt directly with the conspiracy's clients and assuaged their concerns about the delivery delay. He waited with Adams in the house for Terry to arrive with the crack and followed her to the undercover car to make the delivery and himself receive the money. Additionally, he admitted in open court that he had been involved with Terry's crack-dealing enterprise for five or six years, typically delivering or counting money. Aldotfus was not substantially less culpable than Eleatha Adams. The district court did not err.

### B. Defendant Terry Williams

Terry Williams challenges the sufficiency of the evidence on which the jury convicted him. On appeal, this court must decide "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct.

2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Evans,* 883 F.2d 496, 501 (6th Cir.1989). This standard applies to both direct and circumstantial evidence, *see United States v. Meyers,* 646 F.2d 1142, 1143 (6th Cir.1981), and the court will draw all reasonable inferences in favor of the government. *See United States v. Avery,* 128 F.3d 966, 971 (6th Cir.1997); *United States v. French,* 974 F.2d 687, 695 (6th Cir.1992).

■ Terry points out that the only testimony tying him directly to the conspiracy came from informant Charles Alexander and co-conspirators Eleatha Adams and Aldotfus Williams. Terry contends that "under [FED. R. EVID.] 801(d)(2)(E), there must be some substantial evidence beyond the conspirator's statements themselves to establish the existence of a conspiracy." His brief then launches into a discussion of the findings a district court must make before admitting as "non-hearsay" the out-of-court statements of a defendant's co-conspirators made in further-ance of the conspiracy.[2] Terry argues that "[o]ther than the co-conspirator's *statements,* the vast majority of the proof at trial had to do with the specific events at the house on Doris, which in substance dealt directly with the aiding and abetting charge," of which Terry was acquitted. Def. Br. at 9 (emphasis added). Apparently, Terry misunderstands the distinction between "non-hearsay" admissions of co-conspirators as retold by witnesses on the stand and the *direct testimony* of co-conspirators. His argument has some force only with respect to testimony given by Sergeant Booker or informant Alexander as to statements of co-conspirators Eleatha Adams and Aldotfus Williams in furtherance of the conspiracy.[3] But the government did not need to rely on the FED. R. EVID. 801(d)(2)(E) "non-hearsay" rule because, in addition to the testimony of Booker, Alexander, and a bevy of surveillance officers, the prosecution presented the *direct testimony* of co-conspirators Eleatha Adams and Aldotfus Williams.

---

2. Before admitting against a defendant the statements of a co-conspirator as "non-hearsay" under FED. R. EVID. 801(d)(2)(E), a trial court must find that (1) the conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy. *See United States v. Wilson,* 168 F.3d 916, 920 (6th Cir.1999); *United States v. Monus,* 128 F.3d 376, 392 (6th Cir. 1997). Courts sometimes refer to this as an *Enright* finding. *Cf. United States v. Enright,* 579 F.2d 980, 986–87 (6th Cir.1978). The party offering the statements bears the burden of proving these elements by a preponderance of the evidence. *See Bourjaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The "district court may consider the hearsay statements themselves when inquiring into the existence of the conspiracy." *Wilson,* 168 F.3d at 921 (citing *Bourjaily,* 483 U.S. at 181). However, the "contents of the statement … are not alone sufficient to establish … the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered …." FED. R. EVID. 801(d)(2)(E). For example, if the government sought to admit, for the truth of the matter asserted in the statement, testimony by Alexander that Eleatha Adams told him that Terry was at the mall and would bring the crack shortly, the court would have had to make an *Enright* finding. However, if Adams took the stand and recounted her telephone conversation with Terry in which he reported being at the mall, no *Enright* finding would have been necessary because Adams's testimony did not contain statements of co-conspirators in furtherance of a conspiracy, but rather admissions of a party-defendant, admissible as "non-hearsay" under FED. R. EVID. 801(d)(2)(A).

3. Terry has not identified with particularity any statements that an *Enright* finding adverse to the government would have excluded. At oral argument, the government represented that very little of the evidence introduced at trial came in under FED. R. EVID. 801(d)(2)(E), a point Terry did not contest in rebuttal.

■ As Terry's counsel made clear at oral argument, his argument is best understood as questioning whether the testimony of co-conspirators can be used to prove a conspiracy. To establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must prove beyond a reasonable doubt: "1) an agreement to violate drug laws, 2) knowledge and intent to join the conspiracy, and 3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir.1999); *see also United States v. Layne*, 192 F.3d 556 (6th Cir.1999). "[T]he government must prove that the defendant was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives.... The defendant need not be an active participant in every phase of the conspiracy, so long as he is party to the general conspiratorial agreement." *Gibbs*, 182 F.3d at 421 (quotations and citations omitted). "The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great." *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir.1988). The agreement, intent to join it, and participation can all be inferred from acts done with a common purpose. *See United States v. Hughes*, 891 F.2d 597, 601 (6th Cir.1989). "Proof of a formal agreement is not required; it must only be proven that the members of the conspiracy had at least a tacit or material understanding to try to accomplish an unlawful goal." *United States v. French*, 974 F.2d 687, 696 (6th Cir.1992).

Terry has not pointed us to the opinion of any court holding that testimony of co-conspirators cannot be used to prove a conspiracy, and we decline to adopt such a rule today, for the most direct evidence of a conspiracy—a presumably secret agreement to break laws—comes in the form of testimony by co-conspirators as to the fact and terms of the agreement. Such evidence, if believed, is significantly stronger than the circumstantial evidence from which juries regularly (and permissibly) draw inferences about conspiratorial agreements. *See, e.g., Hughes*, 891 F.2d at 601–02. Even if we were to set aside the testimony of the co-conspirators[4]— such as Eleatha Adams's statement that she always got the crack she sold to "Big Daddy" from Terry and Aldotfus's statement that he helped Terry distribute crack—informant Alexander also testified to Terry's involvement in the family crack distribution business, and police officers testified to Terry's arrival and abrupt departure from the back of the house in the moments surrounding the drug delivery and arrest. The record contains ample evidence, to say the least, from which a jury could conclude that Terry intentionally joined and participated in an agreement to violate federal drug laws. The district court did not err in denying his FED. R. CRIM. P. 29(c) motion for judgment of acquittal.

■ Terry additionally argues that the district court should have granted his motion for mistrial after a government witness mentioned evidence that had not been provided to defense counsel before trial in accordance with FED. R. CRIM. P. 16(a)(1)(C) (requiring the government, upon request, to permit the defense to

---

4. Terry describes the testimony of Adams and Aldotfus as "inherently untrustworthy" because both were facing long prison sentences and depending on the government for substantial assistance reductions pursuant to USSG § 5K1.1. In addressing sufficiency of the evidence arguments, the Court of Appeals does not sit as a "thirteenth juror" to assess the credibility of witnesses or re-weigh the evidence. *See United States v. Welch*, 97 F.3d 142, 144 (6th Cir.1996); *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir.1988).

inspect and copy documentary and tangible evidence in the government's possession that is either material to the defense or will be used by the government in its case-in-chief). But Terry's argument only tells part of the story. In the red Camaro, the government discovered a receipt for repair work bearing Terry Williams's name. The government thought it had provided a copy of the receipt to the defense, but acknowledged at trial that a copy probably had not been sent. The government called Officer Michael Wilson to the stand and asked him about the surveillance of 942 Doris and his participation in the pursuit and arrest of the defendant. During cross-examination of Wilson, *defense counsel* asked whether Wilson had seen Terry in the car (he had not), whether he had seen the car drive past his surveillance location (he had not), and whether he took any pictures of the car's interior (he had). The following exchange then ensued:

Q (by defense counsel Johnson): Was there anything in the red car that— anything found in the red car that had Terry Williams's name on it to your knowledge?

A (by Wilson): To my knowledge?

Q: To your knowledge.

A: My understanding that there was [*sic*], but at the time I didn't know.

Mr. Johnson: Your Honor, may we approach?

The Court: You may. (The following proceedings were held at sidebar.)

Mr. Johnson: Your Honor, if there is anything in that car that has Terry Williams's name on it, I have never seen it.

Mr. DiScenza (the AUSA): You sure have, you have got a bill with Terry Williams's name in discovery.

Mr. Johnson: I have never got that.

JA at 155–56. After finding that the failure to disclose had been inadvertent and had not prejudiced the defendant, the court imposed the harshest sanction mentioned in FED. R. CRIM. P. 16(d)(2): it prohibited introduction of the receipt.

Terry now contends that the district court should have granted his motion for mistrial because the jury heard the question and answer, making the document itself no longer important since the jury knew it existed and tied Terry to the vehicle. Despite all the other evidence against him, including direct testimony of co-conspirators that they participated in a criminal enterprise with the defendant, Terry considers evidence that he drove the red car essential to the government's case.

▋ This court reviews a district court's refusal to order a mistrial for abuse of discretion. *See United States v. Talley,* 194 F.3d 758, 764 (6th Cir.1999). "[A] determination of the fairness to the accused is the primary concern in ruling upon a mistrial motion" of this sort. *United ed States v. Atisha,* 804 F.2d 920, 926–27 (6th Cir.1986). In *Atisha,* the district court admitted (over defense objections and motions for mistrial) evidence that the government had developed during trial undermining the defense theory advanced in counsel's opening statement. This court held that "if, by admitting this evidence, the trial was not rendered unfair, ... the district court can[not] be said to have abused its discretion by denying defendant's motion for a mistrial." *Ibid.*

Here, of course, the district court excluded the evidence. And Terry's appraisal of the significance of testimony that "[some]thing [was] found in the red car that had Terry Williams's name on it" is off base. The government presented a great deal of proof tying Terry to the car, including Aldotfus's report that his "brother" would bring the crack in a red sports car, Adams's testimony that Terry arrived in the red Camaro, the surveillance offi-

cers' testimony that they observed the Camaro pull up to the rear of the Doris house, and officers' testimony that they chased Terry from the rear of the house, where they found the keys to the Camaro. The government did not need the receipt to tie Terry to the car, and its decision not to use the receipt in its case-in-chief takes it out of Rule 16's ambit. Defense counsel Johnson asked a question he thought he knew the answer to, but as it turned out, he was mistaken. Officer Wilson's reluctant and ultimately vague response to a question by defense counsel did not render the trial unfair. The district court did not abuse its discretion in so holding.

### III

We therefore AFFIRM the judgments of conviction and sentence for both Aldotfus Williams and Terry Williams.