**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William A. GROSS, (02–5151) Gerome
Bates, (02–5178), Defendants–
Appellants.**

**Nos. 02–5151, 02–5178.**

United States Court of Appeals,
Sixth Circuit.

Oct. 2, 2003.

Before NORRIS, BATCHELDER, and ROGERS, Circuit Judges.

## INTRODUCTION

ROGERS, Circuit Judge.

Defendants William Andrew Gross and Gerome Bates pleaded guilty to conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 18 U.S.C. § 2. They now appeal the sentences imposed for those crimes, arguing that they each should not have received a two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). Gross also argues that since the firearm enhancement should not have been applied, he should have received a two-level reduction under the U.S.S.G. § 5C1.2 "safety-valve" provision because he met all of the other criteria. Because the factual findings of the district court

were not clearly erroneous, we AFFIRM the judgment of the district court.

## BACKGROUND

The facts in this case are undisputed, and are limited to those found in the defendants' Presentence Reports ("PSRs"). Gross and Bates were both couriers in a rather extensive drug ring that trafficked in both cocaine and marijuana. Gross began working as a courier for the drug ring sometime after March 1, 1999, and made numerous trips to Arizona and Texas where he obtained both marijuana and cocaine. He then transported these drugs to Memphis.

While involved in the drug conspiracy, Gross sold cocaine to Terry Wright, another defendant in the proceedings below who is not a party in this appeal. These sales took place over an extended period of time and were for various quantities of cocaine. Wright converted the powder cocaine into crack cocaine inside his home, and then sold the crack cocaine from this same residence. On September 2, 2000, a search warrant was executed at Wright's residence, and a loaded Colt 45 semi-automatic pistol and an Amedo–Ross 44 mag rifle, along with drugs and drug paraphernalia, were found.

Gross also worked with Bates during his involvement with the drug conspiracy. Initially, Gross transported cocaine from Texas to Memphis where he sold some of the cocaine to individuals such as Bates. This relationship, with Gross as courier and Bates as buyer and distributor, continued for a twelve-month period. In January 2001, Bates accompanied Gross on a trip to Texas, where they obtained eight kilograms of cocaine and returned to Memphis.

Gross was arrested on January 21, 2001, for unlawful possession of a weapon after

being pulled over by the police. Gross was the driver of the vehicle, which also contained other passengers; he was stopped for speeding and drunken driving. He passed a field sobriety test, but the registration of the vehicle was not on file. Gross told the police that he had rented the vehicle and that the paperwork was in the glove compartment. While looking for the paperwork, the police found a Smith and Wesson pistol with a loaded magazine in the glove compartment. Gross told the police that he did not have a permit for the gun.

Gross was arrested again on January 30, 2001, and one kilogram of powder cocaine was found in his vehicle. After he consented to a search of his home, the police found a bulletproof vest along with a small quantity of marijuana and other drug paraphernalia. Gross also admitted to the officers that he and Bates had obtained kilogram quantities of cocaine from Texas and were planning another trip there. Gross further agreed to assist the police with a surveillance of Bates.

On February 6, 2001, while under police surveillance, Gross and Bates met at an O'Charley's restaurant. After leaving the restaurant, Bates went to Wal-mart where he bought a food vacuum sealer. Bates used this vacuum sealer to package some large quantities of cash, which he then delivered to Gross at Gross's home. Bates and Gross then met at a shopping center to begin another trip to Texas, and they were stopped by the police shortly thereafter. The police later conducted a search of Bates's residence and found a loaded Intratec 9mm handgun, a loaded Beretta 9mm handgun, a loaded Glock 40 caliber handgun, a Food Saver vacuum machine, various items of ammunition, eight cell phones, a cell phone cloning machine, three cell phone cloning cables, two bottles of Tussonex, personal and business papers, assorted phone numbers, bank receipts, an NBC checkbook, and two Rolex watches, along with some other jewelry.

On June 12, 2001, an indictment was filed against Gross and Bates as well as several other defendants. Multiple counts were charged against both Gross and Bates, but in October 2001, both agreed to plead guilty to Count 1 of the indictment (conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 18 U.S.C. § 2) in exchange for the other charges against them being dropped.

Following the guilty pleas, both defendants' PSRs recommended that they receive a two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1). Gross and Bates filed position papers objecting to the § 2D1.1(b)(1) firearm enhancement. Gross argued that there was no evidence that he possessed a weapon in connection with the offense, and that it was not reasonably foreseeable to him that his co-conspirators possessed firearms. Gross further argued that since the firearm enhancement was not applicable, he should have received a two-level reduction under the U.S.S.G. § 5C1.2 "safety-valve" provision because he met all of the other criteria. Bates argued that the firearms found in his home were not in his possession when he was arrested and were not used in furtherance of the conspiracy. The district court rejected both of the defendants' arguments, finding that Bates was in constructive possession of the firearms found in his home, and that it was reasonably foreseeable to Gross that some of his co-conspirators possessed firearms in furtherance of the conspiracy. The district court further held that, since the firearm enhancement was appropriate for Gross, the "safety valve" reduction was inapplicable.

## ANALYSIS

### A. Standard of Review

"A sentencing court's determination that a convicted defendant possessed a dangerous weapon during the commission of a drug distribution offense constitutes a factual finding reviewed for clear error under the preponderance of the evidence standard." *United States v. Dunlap,* 209 F.3d 472, 476 (6th Cir.2000); *see also* 18 U.S.C. § 3742(e). "A finding of fact is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 476 n. 8 (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518, (1985)).

### B. The § 2D1.1(b)(1) Firearm Enhancement

Defendants Gross and Bates argue that they should not have received a two-level enhancement of their sentences under U.S.S.G. § 2D1.1(b)(1). Section 2D1.1(b)(1) of the sentencing guidelines provides that in drug trafficking cases: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. (n.3). Once possession is established, the burden shifts to the defendant to show that it was clearly improbable that the weapon was connected with the offense. *See United States v. Cochran,* 14 F.3d 1128, 1132 (6th Cir.1994).

### C. The District Court's Finding that Bates Constructively Possessed a Weapon in Connection With the Conspiracy to Distribute Controlled Substances Was Not Clearly Erroneous

The district court did not commit clear error in finding that Bates constructively possessed a weapon in connection with the drug conspiracy, and therefore correctly applied the § 2D1.1(b)(1) firearm enhancement to Bates's sentence. Constructive possession of a weapon means that there must be ownership, dominion, or control over the weapon or dominion over the premises where the weapon is located. *See Cochran,* 14 F.3d at 1132. The district court found that Bates had constructive possession of the weapons because the weapons were located at Bates's residence during the conspiracy, and Bates had the ability to exercise dominion or control over them. Although none of the things found at his residence were "strictly speaking drug paraphernalia," there were a number of items that were connected to trafficking in drugs. The court further noted that there was no suggestion that the guns "had any purpose other than use in drug trafficking or being connected to drug trafficking" and concluded that it was not clearly improbable that the weapons were connected with the offense.

In this appeal, Bates concedes that he possessed the weapons during the conspiracy. He contends, however, that the district court's finding that the weapons were connected to the drug conspiracy is clearly erroneous because it was clearly improbable that he possessed these weapons in connection with the offense. He asserts that the factual record in the PSR fails to point to any evidence of a connection between the weapons and the drug conspiracy. Specifically, Bates argues that (1) his arrest and the seizure of cash did not take place at his residence, where the weapons were found; (2) there was no evidence that he stored drugs, drug paraphernalia, or drug proceeds at his residence; (3) there was no evidence that he conducted drug business from his home; and (4) there was no evidence that he took the weapons from the residence during the conspiracy.

This court has upheld findings in various circumstances that a defendant was in constructive possession of a weapon in connection to a drug offense. *See United States v. Moses,* 289 F.3d 847 (6th Cir.2002); *United States v. Pruitt,* 156 F.3d 638 (6th Cir.1998); *United States v. Hill,* 79 F.3d 1477 (6th Cir.1996). According to Bates, these cases are each distinguishable either because the premises upon which the weapons were found were used to store or manufacture drugs, or because the defendant admitted possessing weapons during the drug conspiracy even though the weapons weren't found on the defendant's person or premises. Bates may be correct that each of these cases is distinguishable in one way or another, but that does not preclude us from deciding that the firearm enhancement was appropriate in this case.

The court in *Moses* set forth a list of factors for determining whether a weapon was related to a particular drug offense, including (1) the proximity of the weapon to the drugs, (2) the type of weapon involved, (3) whether the weapon was loaded, and (4) any alternative purpose offered to explain the presence of the weapon. 289 F.3d at 850. The first factor in this analysis arguably weighs in favor of Bates, as there was no evidence that any of the weapons had been in close proximity to the drugs, or that drugs had ever been in Bates's residence. However, it would not be logical to limit the question of proximity to the actual drugs, while disregarding proximity to other items that were used in furtherance of the drug conspiracy. When the police searched Bates's home, one of the items that they found was a food vacuum sealer. There is evidence in the record that this vacuum sealer had been used to package some cash that was going to be used to purchase cocaine. Given the close proximity of the weapons and the food vacuum sealer—an article used in further-

ance of the drug conspiracy—the first factor of the *Moses* test weighs against Bates.

The final three factors even more clearly weigh against Bates. First, the weapons involved—two 9mm handguns and a 40 caliber handgun—were not atypical to those involved in drug trafficking. *Cf. United States v. Garner,* 940 F.2d 172, 175–76 (6th Cir.1991) (finding that it was clearly improbable that a gun was connected to the drug offense because the gun was a single shot antique Derringer); *United States v. Hough,* 276 F.3d 884, 895 (6th Cir.2002) ("This was not an antique blunderbuss in a curio shop, but a small, easily concealed pistol in the upstairs of a crack house."). Second, each of the weapons was fully loaded. Finally, Bates has not offered any persuasive alternative purpose to explain the presence of the weapons.

Accordingly, since all of the factors of the *Moses* test weigh in favor of finding a connection between the weapons and the drug conspiracy, we affirm the district court's application of the § 2D1.1(b)(1) firearm enhancement to Bates's sentence. Given the evidence in this case, it was not clear error for the district court to find that it was not clearly improbable that Bates possessed the weapons in connection to the drug conspiracy.

D. *The District Court's Finding that It Was Reasonably Foreseeable to Gross That His Co-conspirators Possessed Weapons During the Conspiracy to Distribute Controlled Substances, and Subsequent Denial of the "Safety–Valve" Reduction, Was Not Clearly Erroneous*

■ The district court did not commit clear error in finding that Gross could have reasonably foreseen that a co-conspirator had weapons in connection to the drug conspiracy, and therefore correctly

applied the § 2D1.1(b)(1) firearm enhancement to Gross's sentence. In finding that the § 2D1.1(b)(1) firearm enhancement applied to Gross's sentence, the district court relied on *United States v. Williams,* 894 F.2d 208 (6th Cir.1990), where the court stated that "the enhancement of a sentence can be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable." *Id.* at 212 (citing Commentary, Application Note One, § 2D1.4). The district court ruled that although the record lacked any specific facts linking Gross with weapons, it was nonetheless reasonably foreseeable to Gross, based on Gross's overall knowledge of the conspiracy, that his co-conspirators possessed weapons. The district court further held that because the § 2D1.1(b)(1) firearm enhancement was applicable, Gross did not meet the requirements for the safety valve reduction.

Gross argues that the district court clearly erred in finding that he could have reasonably foreseen that his co-conspirators possessed weapons. He relies on *United States v. Cochran,* 14 F.3d 1128 (6th Cir.1994). *Cochran* recognized that " 'possession of a gun by one coconspirator is attributable to another coconspirator if such possession constitutes reasonably foreseeable conduct.' " 14 F.3d at 1132 (quoting *United States v. Chalkias,* 971 F.2d 1206, 1217 (6th Cir.1992)). *Cochran* also made clear that the test of whether conduct is reasonable foreseeable is objective. 14 F.3d at 1132.

*Cochran* involved a defendant who purchased one gram of methamphetamine from his cousin, Jerry Goswick, every time he received his paycheck, equivalent to two times a month. *Id.* at 1129. Cochran also knew that his cousin made weekly visits to Cleveland, Tennessee, to purchase six to ten grams of methamphetamine. *Id.* The defendant was arrested after accompanying Goswick on one of the weekly trips to Cleveland to purchase the drugs. *Id.* at 1130. This was only the second time that Cochran had accompanied his cousin on one of these trips, and although he was fully aware of Goswick's purpose in making the trip, he accompanied his cousin because "Goswick had a back problem and preferred not to drive alone." *Id.* at 1129–30. Unbeknownst to Cochran, Goswick had a fully-loaded .22 caliber revolver and some additional rounds hidden under his seat. *Id.* at 1130. At his sentencing, Cochran testified that he considered his cousin to be a "small time" dealer, and that it never occurred to him that Goswick would resort to violence to protect his drug operation or that he was accompanying Goswick for additional protection. *Id.* at 1133.

The *Cochran* court held that given these facts, there was no evidence from which the district court could reasonably infer that Cochran knew that Goswick would be carrying a firearm. *Id.* In doing so, the court considered a Fourth Circuit decision, *United States v. White,* 875 F.2d 427 (4th Cir.1989), in which that court stated that " 'it is not unreasonable to recognize that weapons have become "tools of the trade" in illegal narcotics operations.' " *Cochran,* 14 F.3d at 1133 (quoting *White,* 875 F.2d at 433). In response to the *White* decision, the *Cochran* court stated that "[w]e are not willing to indulge the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions." 14 F.3d at 1133. Instead, the *Cochran* court required "that there be objective evidence that the defendant knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed." *Id.*

Gross argues that the district court's decision is more consistent with the *White* court's view that it is always reasonably foreseeable that guns are possessed in drug trafficking crimes, and therefore that the district court's decision was clearly erroneous because the Sixth Circuit has refused to follow *White.* He also argues that there is no objective evidence showing that he could have reasonably foreseen that one of his co-conspirators would have weapons at their home.

The district court did not commit clear error in finding that Gross could have reasonably foreseen that a co-conspirator had weapons in connection to the drug conspiracy. The present case is distinguishable from *Cochran* in several ways. First, the two co-conspirators who possessed the weapons in this case were not "small time" dealers as the defendant believed Goswick was in *Cochran.* The undisputed facts show that Gross had been working with both Wright and Bates for an extended period of time. Gross had sold quantities of powder cocaine up to a quarter kilogram to Wright, and Wright then converted this into crack cocaine which he sold from his home. Furthermore, Gross knew that Bates was "heavily involved in the distribution of cocaine in the Memphis area," and Gross had distributed several kilograms of cocaine to Bates on multiple occasions. Just the week before his arrest, Gross and Bates had made a trip to Texas together where they purchased eight kilograms of cocaine and transported it back to Memphis. Considering Wright's and Bates's heavy involvement in the drug trade, it was much more foreseeable to Gross that they would possess weapons than it was to the defendant in *Cochran.*

Second, Gross himself was much more heavily involved in the drug trade than the defendant was in *Cochran.* The defendant in *Cochran* was a regular purchaser of small amounts of methamphetamine and had only recently begun helping his cousin transport drugs, whereas Gross had been involved in the drug trade for some years and had acted as a courier for quite large amounts of drugs on numerous occasions. Given Gross's own heavy involvement in the drug trade, it was again much more foreseeable to Gross that his co-conspirators would possess weapons than it was to the defendant in *Cochran.*

Third, and most importantly for the test explained in *Cochran,* objective evidence exists that Gross knew that some of his co-conspirators possessed weapons. Among the items found at his residence after he was arrested was a bulletproof vest. Gross has offered no explanation for this item, and although it is not illegal itself, it does show that Gross apparently thought he needed to have some protection from people who carried firearms. The district court could reasonably infer from his possession of the bulletproof vest that Gross thought there was some reasonable probability that his co-conspirators possessed firearms. Additionally, only the week before his arrest for the offenses charged in this case, a loaded pistol was found in the glove compartment of a vehicle which Gross was driving.

■ Given these facts, Gross could have reasonably foreseen that his co-conspirators possessed weapons in furtherance of the drug conspiracy, and therefore the district court's application of the § 2D1.1(b)(1) firearm enhancement to Gross's sentence must be affirmed. Because the district court did not commit clear error in applying the § 2D1.1(b)(1) firearm enhancement to Gross's sentence, the judgment of the district court denying a § 5C1.2 safety valve reduction is also affirmed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.