RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0004p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

NATHANIEL BENSON (08-1131) and CYNTHIA
SHANK (08-1358),

                *Defendants-Appellants.*

Nos. 08-1131/1358

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00006—Robert Holmes Bell, District Judge.

Argued: August 6, 2009

Decided and Filed: January 12, 2010

Before: SILER, GIBBONS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Brian R. Laxton, MERTENS, LAXTON AND CLEMENT, PLLC, East Lansing, Michigan, Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellants. John C. Bruha, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Brian R. Laxton, Scott A. Mertens, MERTENS, LAXTON AND CLEMENT, PLLC, East Lansing, Michigan, Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellants. John C. Bruha, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

    SILER, Circuit Judge. Defendants Nathaniel Benson and Cynthia Shank appeal their convictions and sentences based on their connection with a drug conspiracy. For the reasons that follow, we AFFIRM the judgments of the district court.

1

**BACKGROUND**

**I. Offense Conduct**

In early 1997, Shank (nee Valdez) began a relationship with Alex Humphry. Within the course of a few months, she moved in with Humphry and discovered that he was involved in distributing drugs.

In January 1998, police stopped the pair at a bus station in Dearborn, Michigan, while they were en route to Miami, Florida. When questioned by officers, the couple used false names and stated that they had no identification. After Shank provided consent to be searched, an officer discovered approximately $17,780 on her person. Agents seized the money for forfeiture which the couple did not contest.

In September 1998, Shank purchased a home at 1609 Comfort Street in Lansing, Michigan. She and Humphry used the home as a base of operations for their drug enterprise, receiving and processing shipments of marijuana and cocaine at the house and ultimately making sales. Shank assisted Humphry in the enterprise by counting money, receiving drug shipments, and placing the home, as well as vehicles and telephones, in her name.

Benson was identified as one of Humphry's main customers. Various witnesses testified that Humphry delivered cocaine to Benson's apartment, that Benson bought both marijuana and cocaine at the Comfort Street house, that Benson obtained multiple kilograms of cocaine from Humphry, and that Benson sold drugs obtained from Humphry, both in Humphry's presence and elsewhere. Co-defendant Alfred Williams also testified that he sold a half a kilogram of cocaine on behalf of Humphry to Benson, and saw Benson receive a kilogram directly from Humphry in March 2002.

In May 2002, an unidentified assailant shot Humphry outside the Comfort Street house. Shank transported Humphry to the hospital where he died. At the hospital, Shank lied to police officers about the location of the shooting. She became more truthful in subsequent interviews revealing the true location of the murder, and eventually the true size of the drug operation (both in terms of the quantity of drugs and the amount of cash in the Comfort Street home).

While Shank was at the hospital, other members of the operation took a bag with approximately $230,000 out of the Comfort Street house. Eventually, Shank received approximately $130,000 of that money. Upon searching the house, officers uncovered twenty kilograms of powder cocaine, a kilogram of cocaine base (crack cocaine), and forty pounds of marijuana. Officers also discovered approximately $40,000, additional evidence of the drug enterprise, and a number of firearms.

After Humphry's murder, a witness identified Benson as one of the assailants. Police officers arrested Benson in May 2002, and eventually charged him in state court with murder. Upon searching a Cadillac that Benson drove and was registered to Benson's girlfriend, Latosha Beard, officers discovered six empty boxes of baking soda. During a subsequent search of Benson's apartment at 900 Long Boulevard, officers discovered an empty kilogram wrapper similar to those at the Comfort Street house, approximately $1000, a shotgun, a .22 caliber rifle, and ammunition that did not correspond to either weapon. The state eventually dropped the murder charges and it no longer considers Benson a suspect.

A grand jury in the Western District of Michigan indicted thirteen defendants in connection with the Humphry drug conspiracy. Shank was charged with four counts of the indictment for conspiracy and possession with the intent to distribute drugs in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Benson was charged with one count of conspiracy in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. All defendants other than Shank and Nathaniel Benson pled guilty to various charges.

## II. Trial Proceedings

In October 2007, Shank and Benson were tried together. The jury found both guilty of all charges against them.

In count 1 of the indictment, the government charged Shank with conspiracy to possess and distribute a quantity of drugs "from in or about 1999 to at least May 9, 2002." Shank moved the court to exclude the evidence of the 1998 currency seizure. The district court denied the motion.

As a result of the district court's ruling, the government presented the testimony of Jonathon Burkeen–a co-defendant who pled guilty–that concerned drug activities by Shank

prior to 1999. The government also presented the testimony of several witnesses concerning the 1998 currency seizure.

During trial, the government presented the testimony of numerous other co-defendants, including the fact that each had pled guilty to at least one charge in the indictment. At the end of the trial, the district court provided the following instruction to the jury:

> You have heard that several witnesses were involved in the same crime alleged that the defendants are charged with committing. You should consider such a witness's testimony with more caution than the testimony of other witnesses, not convicting the defendants based on the unsupported testimony of such a witness standing alone unless you believe his testimony beyond a reasonable doubt.
>
> The fact that some other witnesses have pleaded guilty to a crime is no evidence that the defendants are guilty. You cannot consider this against the defendants in any way.

Neither defendant objected to the timing or manner of the district court's instructions at trial.

Shank presented a defense claiming that Humphrey kept her under constant duress during their relationship. The district court conditionally admitted testimony concerning out-of-court, co-conspirator statements and eventually found the statements admissible after an *Enright* inquiry. Benson did not make a Rule 29 motion for a judgment of acquittal at any stage during the trial proceedings and did not object to the testimony or statements of co-defendants as being inadmissible hearsay.

## III.  Shank's Sentencing

After Shank's conviction, the presentence investigation report (PSI) presented to the district court set Shank's advisory Guidelines range as 360 months to life in prison based on an offense level of 42 with a criminal history category of I. The PSI enhanced her base offense level of 38 (for the quantity of drugs) by 2 levels based on the possession of firearms and another 2 levels for obstruction of justice based on her testimony to establish her duress defense. Shank objected to both enhancements. The district court denied the firearms objection, but granted the obstruction of justice objection. The reduced offense level of 40 corresponded with a Guidelines range of 292 to 365 months.

The district court ultimately sentenced Shank to 180 months–120 months each concurrently for Counts 1, 2, and 3 of the indictment and 60 months consecutively for Count 4. This sentence represents a 112-month downward variance from the final calculated Guidelines range.

## IV. Benson's Sentencing

Benson's PSI set his advisory Guidelines range as 210 to 262 months in prison based on an offense level of 36 and a criminal history category of II. The PSI based Benson's initial offense level, 34, on drug quantities attributable to him by a preponderance of the evidence. Some quantities used in the report exceeded the maximums of the jury verdict. The court found that the amounts of cocaine, cocaine base, and marijuana attributed to Benson in his PSI were "higher" than the amounts the jury assessed, but "fair in light of all of the relevant conduct in this matter."

Benson also received a two-level enhancement for possession of a firearm, based on evidence that Benson possessed two handguns and the foreseeable use of the firearms found in Humphry's residence in the conspiracy. Over Benson's objection, the court found that the sentencing enhancement was proper based upon the guns and ammunition found in his apartment on Long Boulevard. Further, it found that since Benson was a part of the conspiracy, the guns found in Humphry's residence could also be attributed to Benson. Benson was sentenced to a within-Guidelines sentence of 216 months' imprisonment.

## DISCUSSION

**Cynthia Shank**

## I. Admission of the January 1998 Currency Seizure Evidence Against Shank

Shank appeals the district court's admission of evidence relating to the 1998 currency seizure as plain error. She argues that the district court's actions of admitting evidence of the 1998 currency seizure at trial amounted to a constructive amendment of the indictment because the seizure occurred approximately eleven months before the indictment's "in or about 1999 to at least May 9, 2002" time frame. However, the introduction of the 1998 currency evidence did not result in a constructive amendment.

"[W]here no specific objection is raised regarding a constructive amendment or a variance before the district court, we are limited to 'plain error' review on appeal." *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008) (citations omitted). We have held that a

> constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment.

*United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007) (citing *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003)). A constructive amendment is considered per se prejudicial and reversible error. *Budd*, 496 F.3d at 521 (citing *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000)).

An indictment need not allege that criminal activity occurred on the exact date proven at trial. *See Ledbetter v. United States*, 170 U.S. 606, 612 (1898). When an indictment uses the language "on or about," a constructive amendment does not exist when "the proof offered regards a date 'reasonably near' the date alleged in the indictment." *United States v. Hettinger*, 242 F. App'x 287, 295 (6th Cir. 2007) (citing *United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989)).

Shank contends that the difference of eleven months in time between the currency seizure and the beginning date of the indictment implies that the two events did not occur "reasonably near" one another. In *Ford*, we held that a similar eleven-month difference exceeded the bounds of reasonableness. 872 F.2d at 1236-37. However, there the grand jury had, by indictment, charged the defendant with possession of a handgun "on or about September 28, 1987." *Id.* at 1233. We held that the district court, through its instructions, allowed the jury to convict the defendant of possession of the handgun, a one time criminal action, on any of three dates within an eleven-month period. *Id.* at 1236. The instant case is distinguished from *Ford*, because here the jury convicted Shank based on her role in an ongoing conspiracy for which the grand jury had already returned an indictment which covered more than three years.

We have previously deemed a difference of more than a month reasonable for a one-time conspiracy with an indictment establishing a seven-day time span. *See United*

*States v. Manning*, 142 F.3d 336, 339-40 (6th Cir. 1998). Given the large time period covered by the indictment in the instant case, the currency seizure occurred "reasonably near" the dates of the indictment. Therefore, any reference at trial to the 1998 currency seizure did not constructively amend the indictment. Likewise, Shank's argument that allowing evidence of the currency seizure in Dearborn when the indictment only discussed Shank's actions in Lansing also fails as she has presented no authority to support this argument. Thus, the district court did not commit plain error.

Even assuming Shank could show that the currency seizure was not "reasonably near" the indictment's time period or that the district court delivered erroneous jury instructions, she has failed to demonstrate a "substantial likelihood that [she] may have been convicted of an offense other than the one charged in the indictment." *See Budd*, 496 F.3d at 521. The body of evidence linking Shank to the conspiracy–including her own testimony–implies that, even if the district court admitted evidence of the currency seizure erroneously, the jury could convict her based on the events occurring between 1999 and Humphry's death alone. As such, any error by the district court does not rise to the level of a constructive amendment.

Lastly, evidence of the 1998 currency seizure is "inextricably intertwined with the charged offense . . . the telling of which is necessary to complete the story of the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (citation omitted). Therefore, even if introducing the evidence is considered a constructive amendment of the indictment, the evidence was properly admitted as relevant background evidence, which is not excluded under Federal Rule of Evidence 404(b). *Id.*

## II.  Admission of Co-Conspirator Guilty Pleas Evidence Against Shank

Shank argues the district court's limiting instruction with regard to her co-defendants' testimony of their guilty pleas constituted plain error. She also claims that the prosecutor improperly referenced the guilty pleas in closing argument. Because the court gave an adequate limiting instruction and the prosecutor's remarks were not prejudicial, the district court did not commit plain error.

A.  *The limiting instruction given by the district court was not plain error*

Shank argues that the limiting instruction given at the end of trial concerning her co-defendants' guilty pleas was insufficient, and specific curative instructions should have been given at the time each co-defendant testified at trial.  Since Shank failed to raise any objections concerning her co-defendants' guilty pleas, we can reverse only for plain error affecting substantial rights.  *See United States v. Christian*, 786 F.2d 203, 213-14 (6th Cir. 1986) (citing Fed. R. Crim. P. 52(b)).  Co-defendant or co-conspirator guilty pleas are not admissible as substantive evidence of the defendant's guilt.  *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996) (citing *United States v. Blandford*, 33 F.3d 685, 709 (6th Cir. 1994)).  However, guilty pleas may be introduced into evidence if the co-defendant or co-conspirator testifies at trial, for purposes of assessing the witness's credibility.  *Id.*  In these instances, the district court must give a cautionary instruction to the jury informing them of the limited scope in which they may consider the evidence of a guilty plea.  *Id.*

Here, the co-defendants' guilty pleas were properly admitted during trial, without objection, for credibility purposes.  The district court gave an adequate jury instruction at the end of trial regarding the credibility of the witnesses and the use of the guilty pleas.  Shank has pointed to no authority requiring the limiting instruction to be given at the time her co-defendants testified.  Therefore, the district court did not commit plain error in giving an adequate limiting instruction at the close of trial.

B.  *Prosecutorial Misconduct*

Shank alleges that the prosecutor improperly referenced the guilty pleas during closing arguments.  We evaluate prosecutorial misconduct through a two-step test.  *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir.1994)).  We first review whether the prosecutor's statements were improper.  *Id.* (citations omitted).  If the statements were improper, we then determine whether the statements were flagrant, thus warranting reversal, using a four-factor flagrancy weighing test.  *Id.*

Since Shank made no objections to the prosecutor's statements at trial, we review for plain error.  *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009) (citing *United*

*States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)). Even if the prosecutor's statements were improper, they did not amount to reversible error and, therefore, did not affect Shank's substantial rights.

Here, in closing argument, the prosecutor stated, "you heard that a number of the co-conspirators who testified in this case have already pled guilty to this conspiracy, which would certainly further support the fact that the conspiracy existed." The prosecutor also stated in closing,

> And [Lonnie Zrubek] says, no, those weren't his drugs, those were Alex Humphry's drugs, but since he participated in that activity, he was guilty as an aider and abettor. And if Lonnie Zubrek was guilty of being an aider and abettor in the possession of those drugs, then certainly Ms. Valdez, who owned the house, who participated in all this other activity to help Alex Humphry, at a minimum she was also an aider and abettor in the possession of those drugs.

Although guilty pleas may be elicited by the prosecutor on direct examination so that the jury may assess the credibility of the witness, a legitimate introduction of a plea may rise to the level of prejudicial error if the prosecutor suggests in closing argument that the jury use the plea for a prohibited purpose. *Carson*, 560 F.3d at 575. As stated above, introduction of guilty pleas may only be used for credibility purposes and is not substantive evidence of the defendant's guilt. *Sanders*, 95 F.3d at 454. "When reviewing challenges to a prosecutor's remarks at trial, we examine the prosecutor's comments within the context of the trial" to determine whether they amounted to plain error. *Carter*, 236 F.3d at 783 (citations omitted).

Although the statements may have been improper, they did not affect Shank's substantial rights. The following four factors are weighed in making this determination, "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Carson*, 560 F.3d at 575-76 (citing *Carter*, 236 F.3d at 783).

The guilty pleas were mentioned by both parties throughout the trial for the purpose of providing the jury with credibility evidence. In fact, Shank's counsel introduced the fact of Zrubek's conviction. The references in the government's closing may be interpreted as referring to credibility and thus could not have misled the jury. *See id.* at 576. These two comments were certainly isolated. Shank does not contend that any other instance of misconduct occurred. We have held that three instances during the prosecutor's initial closing argument, in fast succession, constituted harmless error. *Id.* These remarks were not extensive and thus not prejudicial.

The prosecutor did not repeat either of his remarks, indicating that they were not intentional. *See id.* Furthermore, "'there was no indication that they stemmed from a deliberate plan to inflame the jury as opposed to unduly-zealous advocacy.'" *Id.* at 577 (quoting *United States v. Shalash*, 108 F. App'x 269, 281 (6th Cir. 2004)).

Finally, the totality of the evidence weighs against any prejudice. Shank's own testimony established her participation in the conspiracy; that fact is uncontroverted. Furthermore, the evidence against her duress claim is strong as well. She never reported an abusive relationship to the authorities, even when questioned after knowing that Humphry had died. She lied to police officers about the drug conspiracy even after she knew of Humphry's death. She also accepted approximately $130,000 of drug profits after Humphry's death. Additionally, the district court provided a limiting instruction to the jury which cured or minimized any prejudice. *Id.* As such, Shank's substantial rights were not affected. Therefore, the prosecutor's remarks, even if improper, were not plain error.

## III. Reasonableness of Shank's Sentence

Shank argues that her sentence was unreasonable based upon her criminal history, her changed circumstances, and the quantity of drugs attributed to her at sentencing. Since the district court properly utilized the correct procedures, took into account all of the mitigating factors, and eventually sentenced Shank to 112 months below her recommended Guidelines range, the district court did not abuse its discretion.

"[W]e review the sentence imposed by a district court for reasonableness utilizing the 'familiar abuse of discretion standard.'" *United States v. Moon*, 513 F.3d 527, 539 (6th

Cir. 2008) (quoting *Gall v. United States*, 128 S. Ct. 586, 594 (2007)).  The reasonableness review is split into two parts: procedural reasonableness and substantive reasonableness. *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006).   Sentences that are properly calculated and within the applicable Guidelines range are presumptively reasonable. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006).

"A sentence may be considered substantively unreasonable when the district court 'select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv[es] an unreasonable amount of weight to any pertinent factor.'" *Collington*, 461 F.3d at 808 (quoting *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005)) (alterations in original).  Shank does not question the procedural reasonableness of her sentence.

The district court did not base Shank's sentence on impermissible factors or give an unreasonable amount of weight to any factor.  It weighed Shank's short criminal history and her circumstances of becoming a mother of three "against the huge quantities and the intimate details she knew and engaged in the Humphry organization."  The district court unquestionably did not focus on the quantity exclusively.  If that had been the case, Shank would have faced a Guidelines range of 235-293 months' imprisonment. Here, the sentence of 180 months represents a 55-month downward variance from a "quantity alone" consideration. The district court granted lenience compared to a "quantity alone" assessment. Any argument by Shank that the quantity alone determined her sentence is baseless.

Furthermore, Shank has not presented an argument explaining why the 112-month downward variance in her sentencing did not represent an adequate consideration of the reduced deterrence her situation demands.  Since the district court utilized the correct sentencing procedures and did not place an unreasonable amount of weight on impermissible factors, Shank's sentence was reasonable.

**Nathaniel Benson**

## I. Sufficiency of the Evidence for Benson's Conspiracy Conviction

Benson argues that the evidence presented at trial was insufficient to support his conviction for conspiracy. Since Benson failed to make a Rule 29 motion for judgment of acquittal at the end of the prosecution's case-in-chief, he waived any objections he may have had to challenge the sufficiency of the evidence. *See United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008) ("This Court will not consider challenges to the sufficiency of the evidence if the defendant failed to make a Rule 29 motion for judgment of acquittal at the end of the prosecution's case-in-chief and at the close of the evidence. Failure to make the required motions constitutes a waiver of objections to the sufficiency of the evidence." (citing *United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002))). Thus, our review is limited to whether there was a manifest miscarriage of justice. *See id.*

Since Benson did not make a Rule 29 motion, this court must affirm unless the record is devoid of any evidence pointing to guilt. *Jordan*, 544 F.3d at 670. Benson admits that a conspiracy existed, but denies any intent to join it. Thus, we review whether there is any evidence that Benson intended to and did participate in the conspiracy.

Numerous witnesses testified that Benson obtained cocaine from Humphry and then re-sold the cocaine, sometimes in the form of crack. Witnesses testified that Benson visited Humphry's residence and sold the drugs that he bought from Humphry in Humphry's presence. Several empty boxes of baking soda, a component used to manufacture crack, were found in Benson's Cadillac. Also, a wrapper for a kilogram of cocaine was found inside Benson's residence. Therefore, the evidence was sufficient to conclude that Benson intended to join the conspiracy and his conviction was not a miscarriage of justice.

## II. Admission of Co-Conspirator Statements Against Benson

Benson argues that the testimony of his co-conspirators implicating him in the conspiracy was improperly admitted because no corroborating independent evidence, other than the statements themselves, supported a finding that he participated in the conspiracy. When, as here, a party does not timely raise an issue in district court or make an objection,

an objection to the error is deemed forfeited and reviewed only for plain error. *United States v. Olano*, 507 U.S. 725, 731 (1993).

Under Federal Rule of Evidence 801(d)(2)(E), for co-conspirator hearsay statements to be admissible, the government must show by a preponderance of the evidence that: (1) a conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the statements were made during the course and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Enright*, 579 F.2d 980, 986-87 (6th Cir.1978).

In arguing his co-conspirators' testimonies should be excluded because a conspiracy had not yet been proved by independent evidence, Benson misconstrues the parameters of Rule 801(d)(2)(E) and the requirements of *Enright*. Further, Rule 801(d) does not apply to statements that are not considered hearsay, such as direct testimony by witnesses, including co-conspirators who testify as witnesses. *See United States v. Williams*, 14 F. App'x 469, 474 (6th Cir. 2001). Benson does not point to any out-of-court statements referenced by his co-conspirators at trial that he considered to be hearsay, but merely alleges the "admission of all the statements concerning Mr. Benson's participation in the conspiracy[] are inadmissible until his participation in the conspiracy is proven." Rule 801(d)(2)(E) and the *Enright* requirements were not implicated when the prosecution presented the direct testimony of Benson's co-conspirators. *See id.*

In *United States v. Clark*, 18 F.3d 1337 (6th Cir. 1994), we held that proof of the defendant's knowledge and participation in the conspiracy must be supported by independent, corroborating evidence other than co-conspirator hearsay. *Id.* at 1341-42. Here, Benson essentially argues that the portions of co-conspirators' testimonies that are not considered hearsay cannot be used as the independent, corroborating evidence to determining whether the hearsay statements meet the *Enright* requirements. No precedent in this circuit requires co-conspirator testimony that is not hearsay to be excluded as insufficient "independent, corroborating evidence" in making an *Enright* determination. In fact, we have previously declined to adopt the rule that testimony of co-conspirators cannot be used to prove a conspiracy, *see Williams*, 14 F. App'x at 475, so we fail to see why it cannot be used to prove participation in a conspiracy for *Enright* purposes. Further, Benson

does not identify which statements, if any, made by his co-conspirators should be considered hearsay. Thus, it would be nearly impossible to discern which statements to use and which to exclude in determining whether the district court erred. Therefore, the district court did not plainly err in admitting the co-conspirators' statements.

## III. Drug Quantities

A. *The drug quantities used in sentencing Benson were supported by a preponderance of the evidence*

Benson argues that the district court erred in the quantities of drugs it used to calculate his Guidelines range because the quantities were not supported by a preponderance of the evidence. Specifically, he argues that the drug quantities that he was sentenced for were larger than the quantities the jury assigned to him in its guilty verdict.

"'A district court's determination of the quantity of drugs used to compute a defendant's sentence is a finding of fact that should be upheld unless clearly erroneous. The district court's finding must be supported by a preponderance of the evidence.'" *United States v. Young*, 553 F.3d 1035, 1051 (6th Cir. 2009) (quoting *United States v. Hoskins*, 173 F.3d 351, 354 (6th Cir. 1999)). In determining drug quantity for sentencing, the sentencing court is not limited to the drug quantity found by the jury in its verdict. *Id.* at 1050.

The jury found Benson guilty of conspiring to possess with the intent to distribute between 0.5 to 5 kilograms of powder cocaine, at least 50 grams of cocaine base, and no marijuana. However, Benson's Guidelines range was calculated based on quantities of 5.85 kilograms of powder cocaine, 1 kilogram of cocaine base, and 80 pounds of marijuana. In determining the quantity of drugs used to compute defendant's sentence, the district court took into consideration the following evidence: six empty one-pound containers of baking soda found in defendant's car; empty kilo packaging found in defendant's apartment; witnesses' testimony that defendant purchased large amounts of cocaine and also marijuana; witnesses' testimony that defendant manufactured significant quantities of crack cocaine; and other drug testimony concerning defendant. The district court did not clearly err in finding that these quantities were supported by a preponderance of the evidence.

B.  *The use of "acquitted conduct" in calculating Benson's Guidelines range was not a violation of the Sixth Amendment*

Benson argues that his Sixth Amendment right to a sentence authorized by a jury was violated when the district court sentenced him based on a larger drug quantity than the jury found him guilty of possessing.  He argues that the jury only found him guilty of possessing up to five kilograms of cocaine, and did not find that he possessed any marijuana and, therefore, he was acquitted of any quantity of drugs not authorized by the jury.

However,  "[s]o long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range."  *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc).

Benson received 216 months' imprisonment based on an offense level of 34 and Guidelines range of 210-262 months.  The jury found Benson responsible for up to 5 kilograms of cocaine and 50 grams or more of crack in connection with the conspiracy.  Since 21 U.S.C. § 841(b)(1)(A) authorizes a term of up to life imprisonment for the amount of  drugs the jury attributed to Benson, his 216-month sentence is not past the "statutory ceiling" that courts should not exceed.  *See White*, 551 F.3d at 385.  Therefore, because the drug quantity was supported by a preponderance of the evidence, the district court's sentence is not a violation of the Sixth Amendment.  *See United States v. Mendez*, 498 F.3d 423, 426-27 (6th Cir. 2007).

**IV.  Reasonableness of Benson's Sentence**

Benson argues that his sentence was unreasonable based on an erroneous two-point firearm enhancement and the disparity between the sentences he and his co-defendants received.  "[W]e review the sentence imposed by a district court for reasonableness utilizing the 'familiar abuse of discretion standard.'"  *Moon*, 513 F.3d at 539 (quoting *Gall*, 128 S. Ct. at 594).  For the following reasons, we find that Benson's sentence was reasonable.

A. *Two-level Firearms sentencing enhancement*

Benson argues that assignment of the two-level enhancement under USSG § 2D1.1(b)(1) for possessing a firearm during commission of the drug conspiracy was unreasonable. Specifically, he argues that there was no evidence that he carried a gun and there was no "clear connection" between himself and the guns used in the drug conspiracy.

"'A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review.'" *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003) (quoting *United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir. 2002)). However, if factual findings of the district court are not challenged, and only the application of those facts as to the Guidelines is challenged, then our review is de novo. *See United States v. Chalkias*, 971 F.2d 1206, 1216 n.12 (6th Cir. 1992). Since Benson only challenges that the guns he possessed at his apartment were not "clearly connected to" the conspiracy, we review de novo. *See id.*

Benson acknowledges that two guns were found in his Long Boulevard apartment, but quickly dismisses them as insufficient under § 2D1.1 because they were without ammunition and he alleges they were not connected to the conspiracy. Under § 2D1.1(b)(1), a two-level increase in a defendant's base offense level is warranted if the defendant possessed a dangerous weapon, such as a firearm, during a drug-related crime.

Witnesses testified that Benson was known to possess two handguns. During the search of Benson's apartment on Long Boulevard, two firearms and ammunition were found. Since Benson possessed the firearms at his apartment during the time of the drug conspiracy, the government met its burden of proving possession of the firearms during the offense. *See United States v. Miggins*, 302 F.3d 384, 390-91 (6th Cir. 2002). Once possession of the firearms during the drug offense was shown, a presumption arose that the guns were connected to the offense. *See id.* at 391. Benson was then required to rebut the presumption by showing that it was clearly improbable that the guns were connected to the offense. *See id.* at 390-91. Benson failed to do so.

Here, there were two weapons (a shotgun and a rifle), ammunition (albeit for different weapons that are not used for hunting), and there was drug paraphernalia (kilo

wrappers, baking soda) found at Benson's residence. Benson used this residence for drug trafficking activity. Although Benson argues there was no connection between the firearms at the residence and the drug conspiracy, the evidence shows otherwise. Thus, Benson did not meet his burden of proving that it was clearly improbable that the two firearms were related to the conspiracy. *See United States v. Edmonds*, 9 Fed. App'x 330, 332 (6th Cir. 2001) (listing six factors for determining relatedness to the conspiracy).

Benson also argues that there was not a clear connection between the guns found at Humphry's residence and the conspiracy as to attribute the guns to him. The § 2D1.1(b)(1) firearms enhancement can be applied to a defendant's sentence if the defendant could have reasonably foreseen that a co-conspirator had weapons in connection to the drug conspiracy. *United States v. Gross*, 77 Fed. App'x 338, 343 (6th Cir. 2003). "'[T]he enhancement of a sentence can be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable.'" *Id.* (quoting *United States v. Williams*, 894 F.2d 208, 212 (6th Cir.1990)).

Unlike the challenge to the application of the Guidelines enhancement for the firearms found in his apartment, Benson's challenge to the district court's finding–that he knew Humphry possessed several weapons, and it was reasonably foreseeable that these weapons were used in the conspiracy– is a challenge to the district court's factual findings, which we review for clear error. *See Gross*, 77 Fed. App'x at 343; *Darwich*, 337 F.3d at 664.

The evidence supports the finding that Humphry possessed firearms and kept them at the residence that he used as a hub for his drug trafficking activities. Further, Benson knew or could have reasonably foreseen that Humphry, a major drug trafficker, possessed weapons in the residence where he kept a significant drug supply and thousands of dollars in currency. Therefore, the application of the two-level enhancement for the possession of a firearm was not clearly erroneous as it was reasonably foreseeable that Benson knew the weapons would be used in furtherance of the conspiracy.

B.  *Sentencing Disparities*

Benson argues that his sentence is unreasonable because he received a lengthier sentence than his co-defendants.  He especially challenges the sentence of Shank, who was convicted of three more counts, but received less time in prison.  He does not challenge the procedures of implementing his sentence, but argues his sentence was substantively unreasonable.

Section § 3553(a)(6) requires the sentencing court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  However, section "3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623 (2007) (emphasis supplied) (citations omitted).

Here, Benson was sentenced within the Guidelines range and, thus, his sentence is presumably reasonable. *Williams*, 436 F.3d at 708.  Unlike Benson, many of his co-defendants accepted responsibility and pled guilty, which resulted in sentencing departures for lower sentences.  Since this court is not concerned with sentences of co-defendants, but only those of defendants with similar backgrounds on a national level, *see Simmons*, 501 F.3d at 623, Benson's argument that Shank received a lower sentence does not render his sentence unreasonable.  Further, Shank had a less substantial criminal history than he did.  As the entirety of the Benson's argument rests on the proposition that his sentence is unreasonable as compared to his co-defendants, his argument must fail.

**AFFIRMED**.