NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0214n.06

No. 10-2625

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| FRANK JUNIOR TATUM, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant - Appellant | ) | OPINION |

Before: BATCHELDER, Chief Judge; NORRIS and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Frank Tatum appeals his jury conviction and sentence on one count of possession with intent to distribute marijuana. Finding no trial or sentencing error, we **AFFIRM**.

## I. FACTS

On May 29, 2010, Tatum was riding as a passenger in a red minivan driven by his uncle, Dwight George Scott, on I-94 eastbound in Michigan when a police officer pulled the van over for traffic violations. Scott consented to a search of the vehicle. The rear seats of the van had been removed. Under a large cover, the officer found 28 bales of marijuana, weighing approximately 600 pounds. Both men were taken into custody.

The following day, a police officer interviewed Tatum and Scott at the jail. Initially, Tatum denied knowing about the marijuana in the van and said he went to Chicago to party. A few minutes

1

later, Tatum acknowledged that he knew the van was loaded with marijuana because, when he got in, he exclaimed, "What the f—?" Tatum denied that he touched any of the packages or the cover.

As part of a plea agreement, Scott agreed to cooperate with the government. At Tatum's trial, Scott testified that his wife's brother, Willie Holmes, was a large-scale marijuana dealer in Battle Creek, Michigan. Holmes directed his marijuana distribution operations through family members and maintained several stash houses. On two occasions, Holmes paid Scott to make runs to Detroit. Holmes paid cash for a red minivan and directed Scott to put the title and registration in his name.

In late May 2010, Holmes arranged for a group to drive to Chicago in a four-car caravan to pick up marijuana and transport it to Battle Creek. On May 28, Holmes contacted Scott to discuss the details of the trip. Holmes told Scott to pick up the red minivan the next morning, and Tatum would be riding with Scott.

On the morning of May 29, Scott and his wife picked up the red minivan, drove to another location to pick up Tatum, and then joined the caravan at a gas station. Scott did not know the driver or passengers who were waiting in a white minivan.

Holmes led the caravan to a Spanish-speaking neighborhood in Chicago, where the vans were parked behind a fast food restaurant. The group went shopping. Within two hours, Holmes received a call that "the supply was ready," so the group returned to the restaurant. Two Hispanic individuals drove Scott, Tatum, and the driver of the white van to a factory where the red and white minivans were parked. The rear seats had been removed and cargo placed in the vans.

Scott drove the red minivan back to the restaurant to meet the others. Holmes instructed Tatum to ride with Scott back to Battle Creek and to watch Scott. This upset Scott because he thought Holmes did not trust him. Holmes instructed his sister, Mrs. Scott, to ride in his vehicle.

Scott knew the purpose of the trip before he left Battle Creek, and he thought that Tatum knew the purpose of the trip as well. Scott testified that, "if [Tatum] didn't know what the stakes was (sic), he wouldn't have been with us." Scott also knew that Tatum did what Holmes told him to do. On the ride home from Chicago, Tatum did not say much to Scott. Tatum turned around once, looked behind the front seats and said, "Yeah, I see we got a lot here." Scott asked, "A lot of what?" Tatum replied, "We got quite a bit." Tatum grabbed one of the bales and said that Holmes was going to pay him the amount he had in his hand for his assistance that day. If the police had not stopped them, Scott thought Tatum would take some of the marijuana as his cut to sell or do with as he pleased.

Holmes bailed Tatum and Scott out of jail. Holmes instructed Scott to ride home in a car with his wife. Tatum rode with Holmes. Upon returning to Battle Creek, Holmes angrily called Scott a snitch because Tatum reported to Holmes that Scott talked to the police while he was in jail.

Although the government presented other witnesses, it did not introduce any other evidence linking Tatum directly to the marijuana found in the red minivan. Tatum did not testify or present a defense. The district court instructed the jury on the elements of the offense, on aiding and abetting, and on actual and constructive possession. The jury convicted Tatum of possessing with intent to distribute more than 100 kilograms of marijuana. The district court sentenced Tatum to 63 months in prison.

3

## II. ANALYSIS

On appeal Tatum contends that the government's proof was not sufficient to convict him, that the district court violated his confrontation right by admitting co-conspirator statements into evidence, and that the district court should have granted a four-level sentencing reduction for minimal participant instead of a two-level reduction for minor participant. These issues do not require reversal.

### A. Sufficiency of the evidence

#### 1. Standard of review

We review *de novo* the district court's denial of Tatum's motions for judgment of acquittal challenging the sufficiency of the evidence. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000).

#### 2. The evidence was sufficient to convict Tatum

We view the evidence in the light most favorable to the government and then consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Tatum bears a very heavy burden to meet this standard. *Id.* We do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury. *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994). Instead, we resolve all credibility issues in favor of the verdict and draw every reasonable inference in favor of the prosecution. *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001). A conviction may be sustained on circumstantial evidence, and the prosecution's proof need not remove every reasonable hypothesis except guilt. *Wright*, 16 F.3d at 1439.

4

The indictment charged Tatum as a principal under 21 U.S.C. § 841(a)(1) and with aiding and abetting under 18 U.S.C. § 2. "The elements of a charge of possession with intent to distribute illegal drugs are: (1) the defendant knowingly, (2) possessed a controlled substance, (3) with intent to distribute." *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006) (cited cases omitted). On the evidence presented at trial and in light of the court's jury instructions, any rational trier of fact could have found that the government proved the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

The jury learned that Tatum was a close associate of Holmes, who ran the drug trafficking operation. Tatum took direction from Holmes and did as he was told. Scott testified that Tatum well knew the scope of Holmes' drug trafficking operation because Tatum would not have been included in the group if he did not understand what was at stake.

Before leaving Chicago with 600 pounds of marijuana in the red minivan, Holmes directed Tatum to ride back with Scott and "watch him." This comment shows that Holmes expected Tatum to protect the marijuana and help the operation succeed. Such a large quantity of marijuana destined for Battle Creek could only have been intended for distribution.

During the ride, Tatum commented on the presence of the marijuana and grabbed one bale, claiming that Holmes would give that amount to him as his cut for helping with the trip to Chicago. Scott believed that Tatum would likely sell the marijuana. Although the government did not present any fingerprint evidence directly linking Tatum to the marijuana bales, the jury could rationally find that Tatum knowingly possessed marijuana, either actually or constructively, with the intent to distribute it or with the intent that it be distributed by others.

5

As the judge of credibility, the jury did not believe Tatum's initial statement to the police that he did not know about the marijuana and never touched it. By convicting, the jury inherently found that Tatum's changed story about his exclamatory remark upon entering the van in Chicago showed that he did know about the marijuana and that the remark was not exculpatory. Because the evidence was sufficient to support the conviction, the district court did not err in denying Tatum's Rule 29 motions for judgment of acquittal.

## B. Admission of co-conspirator statements

### 1. Standard of review

We review for clear error the factual findings underpinning the district court's decision to admit co–conspirator statements and we review *de novo* the court's ultimate legal conclusion that the statements may be received as non-hearsay. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc); *United States v. Damra*, 621 F.3d 474, 492 (6th Cir. 2010). We review *de novo* a defendant's claim that his confrontation right was violated. *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007).

The government contends that we should apply this standard of review to the one occasion during Scott's testimony when Tatum unsuccessfully objected to the admission of a statement made by co-conspirator Holmes. Because Tatum did not simultaneously object to Scott's testimony about other statements Holmes made, the government contends that any challenge to those statements should be reviewed for plain error. *See United States v. Powers*, 500 F.3d 500, 505 (6th Cir. 2007). In conducting plain error review, we will reverse only if there is an error, that is plain, and that affects the defendant's substantial rights. *Id.* If these three criteria are met, we may notice the forfeited error if it seriously affects the fairness, integrity, or public reputation of judicial

6

proceedings. *Id.* Because Tatum's counsel objected to the admission of co-conspirator statements before the jury was selected and again during Scott's testimony, we will not apply the plain error standard, although we recognize this is a close question due to the absence of a continuing objection at trial. Under either standard, however, Tatum cannot obtain relief.

2. *The co-conspirator statements were admissible*

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and it is a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy. Before hearsay statements of a co-conspirator may be admitted into evidence, the prosecutor must show, and the court must find, by a preponderance of the evidence, that a conspiracy existed, that the defendant was a member of the conspiracy, and that the statement was made in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1994). In this Circuit, these prerequisites are commonly known as the *Enright* requirements. *United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978). The district court may conditionally admit statements of co-conspirators, subject to the prosecution's satisfaction of the *Enright* requirements prior to the close of its case. *United States v. Kone*, 307 F.3d 430, 440 (6th Cir. 2002). In determining whether the *Enright* requirements have been met, the district court may consider the co-conspirator statements themselves, *Bourjaily*, 483 U.S. at 181; *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999), but the defendant's knowledge of, and participation in, the conspiracy must be supported by independent, corroborating evidence other than co-conspirator hearsay. *United States v. Benson,* 591 F.3d 491, 502 (6th Cir. 2010) (citing *Clark*, 18 F.3d at 1341–42). Such independent, corroborating evidence may be provided by a member of the conspiracy. *Id.*

7

We can identify no clear error in the district court's factual findings made by a preponderance of the evidence that a drug conspiracy existed, that Tatum was a member of the conspiracy, and that Holmes' statements were made during the course and in furtherance of the conspiracy. *See Damra*, 621 F.3d at 492. As an admitted member of the conspiracy, Scott provided the court and jury with a first-hand account of the conspiracy's members and operations, including the prior trips Scott made to Detroit at Holmes' direction. The district court properly relied on Scott's non-hearsay testimony as independent, corroborating evidence of the conspiracy. *See Bourjaily*, 483 U.S. at 181; *Benson*, 591 F.3d at 502. The prosecution proved the existence of the conspiracy through the direct evidence provided by Scott and through the circumstantial evidence of the traffic stop. The district court's legal conclusion that Holmes' statements were admissible against Tatum under Rule 801(d)(2)(E) was correct as a matter of law.

In *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004), the Supreme Court held that, where the government offers hearsay evidence at trial that is "testimonial" in nature, the Confrontation Clause of the Sixth Amendment requires actual confrontation; in other words, cross-examination of that witness. A statement is not "testimonial" within the scope of the Confrontation Clause unless the statement was "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011). Our case law is in accord with *Bryant* because we have held that "co-conspirators' statements made in pendency and furtherance of a conspiracy [are] not testimonial." *United States v. Stover*, 474 F.3d 904, 913 (6th Cir. 2007) (citing *United States v. Martinez*, 430 F.3d 317, 329 (6th Cir. 2005)).

8

We find no error in the district court's analysis, and the co-conspirator statements of Holmes were properly admitted against Tatum. The admission of the statements did not violate Tatum's confrontation right under the Sixth Amendment.

## C. Minimal participant sentence reduction

### 1. Standard of review

Whether Tatum was entitled to a sentencing reduction for mitigating role under USSG § 3B1.2 depends heavily on factual determinations, so we review the district court's ruling only for clear error. *United States v. Harris*, 397 F.3d 404, 409 (6th Cir. 2005).

### 2. A minimal participant reduction was not warranted

In the presentence report, the probation officer reduced the base offense level by two levels under USSG § 3B1.2(b) to account for Tatum's minor role in the offense. Tatum objected, contending that he was entitled to a four-level reduction under § 3B1.2(a) because he was a minimal participant in the crime. Having considered the evidence presented at trial, the district court found that the minor participant reduction of two levels was "as generous toward the defendant as the scoring can be" and denied Tatum's request for a further reduction.

The "minimal participant" reduction is reserved for defendants who are among the least culpable of those involved in the conduct of a group, and the "minor participant" reduction is for those who are less culpable than most other participants, but whose roles could not be described as minimal. USSG § 3B1.2, cmt. (nn. 4, 5); *United States v. Groenendal*, 557 F.3d 419, 428 (6th Cir. 2009). In light of the trial evidence showing Tatum's close relationship with Holmes and Tatum's expectation that Holmes would pay him for his assistance by giving him a bale of the marijuana, the

9

district court did not clearly err in finding that Tatum was a minor participant, but not a minimal one.

## IV.  CONCLUSION

The evidence was sufficient to convict Tatum of possession with intent to distribute marijuana, the district court did not commit error in admitting the co-conspirator statements of Holmes, and the court did not err in imposing a minor participant sentencing reduction. Accordingly, we **AFFIRM**.